UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Robert E. Anson and
Barbara J. Anson,

Case No. 8:10-bk-21924-MGW
Chapter 11

Debtors.
_____/

**MEMORANDUM OPINION ON DEBTORS' OBJECTION
TO CLAIM NUMBER 18 OF LIBERTY SAVINGS BANK, F.S.B.**

A creditor in this case, Liberty Savings Bank, F.S.B. ("**Liberty**"), has filed a proof of claim for debts arising under two separate loans guaranteed by the Debtors and secured by real property owned by an affiliate company. Two separate lawsuits were filed and two separate judgments were entered with respect to the defaulted loans. The first action was for foreclosure and a deficiency with respect to a second mortgage on the property. Liberty obtained title to the property at the foreclosure sale in that action. The second action was for foreclosure of the first mortgage and damages under a promissory note. Liberty obtained a money judgment in the second action. But it never foreclosed its first mortgage because it had already acquired title to the property in the first action. The Debtors have objected to Liberty's claim because it does not give them credit for the value of the property received at the foreclosure sale in the first action and will result in a windfall to Liberty. The Court agrees and will sustain the Debtors' objection to the extent that Liberty's claim does not give credit for the value of the property received at the foreclosure sale with respect to the second mortgage.

**Findings of Fact**

In 2004, A.C.T. Enterprises, LLC ("**ACT**"), an affiliate of the Debtors, obtained a loan from Liberty. The loan was secured by a note and first mortgage on real property owned by

ACT. As part of the loan transaction, the Debtors personally guaranteed ACT's loan. In 2008, ACT obtained a line of credit from Liberty secured by a second note and mortgage on the same real property. The Debtors again personally guaranteed ACT's obligations under the second note. Both loans subsequently went into default, and Liberty commenced two legal proceedings in state court.[1]

Liberty's first lawsuit contained two counts related to the second note and mortgage: one count to foreclose the second mortgage and a second count seeking a money judgment on the note and personal guaranties (the "**Foreclosure Action**"). On July 31, 2009, Liberty obtained a default against ACT and the Debtors in the Foreclosure Action, and the state court entered a final judgment of foreclosure on September 25, 2009. Thereafter, Liberty was the high bidder at the October 27, 2009 foreclosure sale, and it took title to the property on December 2, 2009, when the clerk of court issued the certificate of title.

Subsequently, Liberty sought a deficiency judgment against the Debtors. In calculating the amount of the deficiency, the state court noted the existence of Liberty's first mortgage on the property, which required a payoff of $295,802.80. The state court added that amount to the $215,043.03 foreclosure judgment, plus accrued interest of $1,166.22, to arrive at a total amount due Liberty of $512,012.05. The state court then subtracted the fair market value of the foreclosed property, which it determined to be $450,000, leaving a deficiency of $62,012.05. Thus, a deficiency judgment in the amount of $62,012.05 was entered on July 7, 2010.

Liberty's second lawsuit was filed on the same day as the Foreclosure Action. It contained the same two counts as the first lawsuit, but related to the first note and mortgage (the

---

[1] The two cases were filed in the Circuit Court for the Twelfth Judicial Circuit, in and for Sarasota County, Florida. Both cases name ACT and the Debtors, individually, as defendants. *See* Case Nos. 2009-CA-008621-NC and 2009-CA-008626-NC.

"**Note & Guaranty Action**"). Again, the Debtors failed to answer the complaint, and on November 20, 2009, Liberty obtained a final default judgment on both counts of the complaint, thereby establishing liability against ACT under the note and against the Debtors under their personal guaranties in the amount of $297,549.76. Liberty chose not to set another foreclosure sale related to its first mortgage, presumably because it was the high bidder on the property at the foreclosure sale in the Foreclosure Action.

On September 9, 2010, the Debtors filed their voluntary bankruptcy petition, commencing this bankruptcy case. Liberty filed claim number 18 in this case, which is comprised, in part, of the $62,012.05 deficiency judgment from the Foreclosure Action, and the $297,549.76 money judgment from the Note & Guaranty Action. Liberty's claim does not, however, give the Debtors credit for the $450,000 payment Liberty received vis-à-vis its acquisition of title to the foreclosed property.

In sum, Liberty asserts, through its claim, that it is still owed $359,561.81, plus interest, on the two state court judgments entered in the Note & Guaranty and Foreclosure Actions. Liberty makes this assertion despite having already received property worth $450,000. Thus, the issue before the Court is whether Liberty's claim should be reduced by the value of the property it received as a result of the foreclosure sale in the Foreclosure Action.

### Positions of the Parties

Liberty has argued that the Court must independently recognize the two judgments from the state court lawsuits as valid and binding. It asserts that the Full Faith and Credit Act and the *Rooker-Feldman* doctrine prohibit this Court from re-evaluating the final judgments based on a lack of subject-matter jurisdiction. Liberty further argues that the doctrines of collateral estoppel

and res judicata preclude the Debtors from challenging the face amounts of the final judgments in the bankruptcy forum.

The Debtors essentially argue that they must be given credit for the value of the property that Liberty acquired in the Foreclosure Action. For the reasons set forth below, the Court rejects Liberty's arguments and agrees with the Debtors that Liberty must give the Debtors credit for the value of the property Liberty foreclosed and now owns.

## Conclusions of Law

The Court has jurisdiction over the parties and this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

### I. Full Faith and Credit & *Rooker-Feldman*

There is no question that the two state court judgments are valid and final. Because the Court recognizes the judgments as such, the Full Faith and Credit Act[2] is not implicated in this matter. The *Rooker-Feldman* doctrine is likewise inapplicable to this matter. This judge-made doctrine establishes the principle that lower federal courts have no jurisdiction to review state court judgments.[3] This Court is not reviewing the validity of the state court judgments or otherwise entertaining challenges to the state court judgments in any sort of appellate capacity. Instead, the Court is simply determining whether the judgments have been partially satisfied; therefore, neither the Full Faith and Credit Act nor the *Rooker-Feldman* doctrine is applicable.[4]

---

[2] The Full Faith and Credit act provides in relevant part that the "judicial proceedings…shall have the same full faith and credit in every court within the United States…as they have by law or usage in the courts of such State…from which they are taken." 28 U.S.C. § 1738.

[3] The doctrine stems from the United States Supreme Court decisions in *Rooker v. Fidelity Trust*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). It is premised on both prudential grounds, namely the preservation of system consistency, and statutory grounds. *See* 28 U.S.C. § 1257 (giving the United States Supreme Court exclusive federal jurisdiction to review state court judgments); 28 U.S.C. §§ 1331 and 1334 (defining the jurisdiction of federal district courts as original, not appellate).

[4] *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that the *Rooker-Feldman* doctrine is confined to cases "brought by state-court losers complaining of injuries caused by state-court judgments

Rather, the primary issue in the instant claim objection is not the validity of the state court judgments but the amounts owed with respect to the judgments in light of Liberty's receipt of payment via obtaining ownership of the foreclosed property. To the extent that Liberty argues that payment should have been raised as a defense in the underlying state court action, the Court finds that a payment defense could not have been raised by the Debtors in state court. The chronology of the state court cases dictates this finding.

At the time the money judgment was entered against the Debtors in the Note & Guaranty Action on November 20, 2009, Liberty had not yet taken title to the foreclosed property in the Foreclosure Action and, therefore, had not yet received payment. Because Liberty did not take title to the property until December 2, 2009, the Debtors were unable to avail themselves of the payment defense in the Note & Guaranty Action.[5] Similar to *In re Burns,* it is only now in the unique bankruptcy context of their claim objection under 11 U.S.C. § 502 that the Debtors can raise the issue of payment, and they do so not to attack or "appeal" the underlying state court judgment but to challenge Liberty's attempt to double recover through the claims process.

## II.    Collateral Estoppel and Res Judicata

Liberty also argues that the doctrines of collateral estoppel and res judicata prevent the Debtors from challenging the state court judgments in this bankruptcy case. The Court rejects this argument. Collateral estoppel, also known as issue preclusion, prevents parties from re-

---

rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"); *see also Miller v. Burns (In re Burns)*, 395 B.R. 756, 761 n.5 (Bankr. M.D. Fla. 2008) (Jennemann, J.) (stating that the *Rooker-Feldman* doctrine does not apply where a plaintiff has not had a reasonable opportunity to raise his federal claim in state proceedings).

[5] Rule 1.110(d), Florida Rules of Civil Procedure, expressly includes payment as an affirmative defense. The payment defense relates only to payments that have already been made or tendered. *See generally* 60 Am. Jur. 2d Payment § 101. The payment defense does not have prospective application. *Morroni v. Household Fin. Corp. III*, 903 So. 2d 311, 311 (Fla. 2d DCA 2005) (finding payment defense valid where defendants in foreclosure suit alleged that they had already made payments to the lender); *Potter v. J. R. Office Furniture & Equip. Co.*, 590 So. 2d 1089, 1090 (Fla. 1st DCA 1999) (ruling in favor of defendant on payment defense because defendant had already paid plaintiff any amounts that were due).

litigating issues that were actually litigated and decided in the prior suit.[6]  Res judicata, also known as claim preclusion, prevents the re-litigation of matters that were, or could have been, litigated in a prior suit.[7]

The Florida Supreme Court has recognized the distinction between these two related doctrines.  In *Avant v. Hammond Jones, Inc.*,[8] the court stated that res judicata brings finality to matters that were or could have been presented, while collateral estoppel, or "estoppel by judgment,"[9] prevents a party from re-litigating questions common to two causes of action when those questions were actually decided in the first case.  Thus, res judicata is broader than collateral estoppel in that it precludes a party from raising a claim in subsequent litigation that could have been raised in the prior suit.

The Court finds that neither res judicata nor collateral estoppel applies in this case.  As set forth in the preceding chronology of the state court actions, the defense of payment in the Note & Guaranty Action was not—and, indeed could not have been—raised before entry of the default judgment on November 20, 2009, because Liberty did not acquire title to the property in the Foreclosure Action until December 2, 2009.[10]  Thus, the Court concludes, based on the chronology of the two state court cases, that res judicata is inapplicable because the Debtors

---

[6] *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986).
[7] *Id.*
[8] 79 So. 2d 423, 424 (Fla. 1955).
[9] Under Florida law, the terms "collateral estoppel" and "estoppel by judgment" are synonymous.  *In re Itzler*, 247 B.R. 546, 552 (Bankr. S.D. Fla. 2000) (internal citations omitted).
[10] The Court wishes to avoid confusion about the meaning of the term "could have raised" with respect to the payment defense, particularly in the context of Liberty having obtained judgment against the Debtors in the Note & Guaranty Action by default.  The Court recognizes that if the Debtors had defended the claims brought in the Note & Guaranty Action, instead of allowing Liberty to obtain a default judgment, then perhaps the chronology would have been different, and perhaps a payment defense would have become available to Debtors if the Note & Guaranty Action had still been pending after December 2, 2009.  This speculation is irrelevant.  It also reminds the Court of the expression: "If 'if's' and 'but's' were candy and nuts, it would be Christmas every day."  The Court bases its decision solely on the state court record as it actually unfolded.  Simply put, a payment defense was unavailable to the Debtors during the pendency of the Note & Guaranty Action.  Whether wittingly or unintentionally, the Debtors have benefitted in this claim objection by electing not to defend that case.

could not have asserted a payment defense in the Note & Guaranty Action before judgment was entered.

Furthermore, even assuming that either res judicata or collateral estoppel is applicable to the Debtors' claim objection, the Court, in its discretion, refuses to apply the doctrines. Both res judicata and collateral estoppel are equitable doctrines that are not to be invoked where they will inflict pernicious results.[11] Because both doctrines are legal fictions designed to promote efficiency and judicial economy, the Court will not lose sight of the larger picture, which shows very clearly that Liberty is attempting to gain a windfall to the detriment of the Debtors and other creditors of their estate. The Court finds such a result to be manifestly unjust.

When Liberty obtained the deficiency judgment in the Foreclosure Action, it was owed a total of $512,012.05. As the winning bidder at the foreclosure sale, and pursuant to the certificate of title, Liberty transformed its interest in the property from a mere security interest to fee simple ownership, thereby divesting the Debtors of a significant asset. The Court finds Liberty's acquisition of title to be the functional equivalent of a $450,000 payment, for which the Debtors must be given credit. Accordingly, simple math dictates that the only remaining balance owed to Liberty by the Debtors is $62,012.05.

To allow Liberty to include as part of its claim the additional money judgment from the Note & Guaranty Action would be akin to sanctioning a windfall or double recovery.[12] Of

---

[11] *Aeacus Real Estate Ltd. P'ship v. 5th Ave. Real Estate Dev., Inc.*, 948 So. 2d 834, 836 (Fla. 4th DCA 2007); *State v. McBride*, 848 So. 2d 287, 291-92 (Fla. 2003) (stating that neither res judicata nor collateral estoppel will be invoked where their application would defeat the ends of justice or result in a manifest injustice).

[12] While neither party has framed the issue before the Court as a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), the Court acknowledges the potential for such a claim. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 536 (1994); *In re Pantani*, 377 B.R. 28, 30-31 (Bankr. D. Conn. 2007) (recognizing potential for fraudulent transfer in foreclosure context if debtor enjoyed significant equity in property but received little or no value from the transfer); *Geddes v. Mayhall Enters., LLC (In re Jones)*, 304 B.R. 462, 473-75 (Bankr. N.D. Ala. 2003) (finding the elements of a constructively fraudulent transfer present where a debtor transferred an asset to a party in satisfaction of debt and received less than reasonably equivalent value in exchange for the transfer); *Bell v. Instant Car Title*

course, Florida law prohibits such conduct, and the Court will not countenance Liberty's attempt to obtain that result here.[13] After all, bankruptcy cases are governed by overriding equitable principles, and equity abhors a windfall.[14] Accordingly, the Court sustains the Debtors' objection and reduces Liberty's claim to the amount of the deficiency: $62,012.05.

### III.     The Merger Doctrine

Although the Court has sustained the Debtors' objection to Liberty's claim and need not, therefore, address the Debtors' alternative argument that the merger doctrine applies to extinguish Liberty's first mortgage, the Court will nevertheless explain why it finds this argument unpersuasive.

Generally speaking, the merger doctrine applies when the mortgagor transfers his interest in the mortgaged property to the mortgagee, such that there is a merger of the legal and equitable estates, thereby resulting in a discharge of the mortgage and satisfaction of the debt.[15] However, there is a presumption against merger if the operation of the merger would be detrimental to the party who possesses both interests.[16] "Whether a conveyance of fee simple title to a mortgagee results in a merger depends upon the intent of the person in whom the interests are united."[17] Intent can be inferred from the actions of the relevant party.[18]

---

*Loans (In re Bell)*, 279 B.R. 890, 898-99 (Bankr. N.D. Ga. 2002) (noting potential for fraudulent transfer where debtor transferred ownership interest in vehicle to pawnbroker in exchange for satisfaction of debt but received less than reasonably equivalent value).
[13] *See FDIC v. Hemmerle*, 592 So. 2d 1110, 1117 (Fla. 4th DCA 1991) (disallowing a claim on a personal guaranty where a second judgment would result in a double recovery).
[14] *Bank of Marin v. England*, 385 U.S. 99, 103 (1966) ("There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction."); *Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989).
[15] *Sanderson v. Hudlett*, 832 So. 2d 845, 848 (Fla. 4th DCA 2002) (citing *Gourley v. Wollam*, 348 So. 2d 1218, 1220 (4th DCA 1977)).
[16] *Westbury Props., Inc. v. Cardillo*, 638 So. 2d 519, 521 (Fla. 2d DCA 1994).
[17] *Id.*
[18] *Jackson v. Relf*, 26 Fla. 465, 468-69 (1890).

The Court understands Debtors to argue that when Liberty foreclosed its second mortgage and took title on December 2, 2009, the first mortgage was automatically extinguished because, at that time, Liberty held both the legal and equitable interests in the property. However, Debtors' argument overlooks the question of Liberty's intent.  In the Note & Guaranty Action, Liberty obtained a money judgment and chose not to proceed with the foreclosure of the first mortgage.  Whether that decision was made (i) because Liberty felt it unnecessary to foreclose its first mortgage, since it had already foreclosed its second mortgage lien, or (ii) because it wanted to retain additional security in the event any additional, previously undisclosed lienholders surfaced, thereby clouding its title, this Court does not know.  Whatever Liberty's reason for not pursuing an actual foreclosure sale on the first mortgage in the Note & Guaranty Action, the Court will infer that it was beneficial for Liberty not to have the merger doctrine apply, in which case the first mortgage would not have been extinguished.

Additionally, because Liberty obtained judgment on the note in the Note & Guaranty Action, it does not matter from a practical perspective whether the first mortgage was extinguished or not.  The Debtors' liability in that case arose from their personal guaranties of the note and was already established in the final default judgment entered on November 20, 2009, prior to the date merger could have occurred.  Thus, even if the merger doctrine did apply, it would not have produced the result Debtors appear to desire, which is that they are somehow alleviated of liability under the first note and mortgage.  Because the question is not whether the Debtors can be relieved of liability under the first note and mortgage, but rather whether the Debtors' liability has been partially satisfied, the merger doctrine has no bearing on this case. For the reasons set forth above, the Court finds that the Debtors' liability under the first note was satisfied, as was a portion of their liability under the second note and mortgage, not through the

merger doctrine but rather through Liberty's acquisition of title to the foreclosed property, at which time Liberty received a $450,000 payment.

## Conclusion

Based on the foregoing, the Court sustains the Debtors' objection to Liberty's claim. It is fundamental that a creditor is not entitled to recover more than the full amount of the debt. The state court in the Foreclosure Action found that Liberty was owed a total of only $512,012.05 as of July 7, 2010. Liberty has already received a $450,000 payment vis-à-vis the acquisition of title to the foreclosed property. By failing to acknowledge its receipt of that payment in its proof of claim, Liberty is attempting to have its cake and eat it too.[19] This Court will not countenance Liberty's attempt to obtain a greater amount than it is legally due. To allow Liberty to claim $359,561.81 in addition to the $450,000 it has already received would result in a windfall of nearly $300,000 to Liberty. Such a result would be patently unjust, contrary to Florida law, and antithetical to the fundamental, equitable principles of bankruptcy law. Liberty's claim is therefore reduced to $62,012.05.

A separate order will be entered sustaining the Debtors' objection to Liberty's Claim.

**DATED** in Chambers at Tampa, Florida, on September 30, 2011.

/s/ M.G. Williamson

Michael G. Williamson
United States Bankruptcy Judge

---

[19] This familiar expression dates back at least 465 years to a 1546 compendium by J. Heywood, in which the expression is phrased "Wolde ye bothe eate your cake, and haue your cake?" *The Concise Oxford Dictionary of Proverbs* 124 (2d ed. 1992). While the modern expression has been reversed from its original phrasing, the expression is best understood as meaning that one cannot have it both ways, as in one cannot both have his cake (i.e., retain possession of the cake in its original physical form) and also eat it because the act of eating necessarily transforms the physical nature of the cake, such that it can no longer be "had."

Copies to:

Howard E. Mentzer, Esq.
Mentzer and Mygrant Ltd.
Akron, Ohio
Attorney for Debtors

James D. Gibson, Esq.
Gibson, Kohl, Wolff & Hric, P.L.
Sarasota, Florida
Attorney for Liberty Savings Bank, F.S.B.